UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>W. CARL REICHEL,<br><br>　　　　Defendant. | Criminal No. 15-CR-10324-DPW |

## DEFENDANT'S INITIAL PRETRIAL MEMORANDUM

The Government is attempting the impossible.  It has alleged facts that do not constitute a crime and proposes to prove "the offense" by introducing categories of inadmissible evidence.  Specifically, the Government believes "the defendant instructed sales personnel to use the free dinners to become friendly with the physicians and 'build relationships.'"  Opp'n to Def.'s Mot. For Pretrial Proffer (ECF No. 63) at 3-4.  That is not an Anti-Kickback Statute violation, and no amount of repeating the statutory elements converts it into a violation even if the relationship leads to increased business.  As to its proof for this supposed violation, the Government has no evidence of an unlawful agreement—conspiracy—between Carl Reichel and anyone.  Instead, it alleges that Mr. Reichel is a person of bad character whose management of the company caused crimes to be committed by people who did not believe they were committing crimes.  These management issues include numerous inadmissible matters that the defendant brings to the Court's attention with this memorandum.  Some of these potential issues may perhaps best be addressed at some point prior to trial but, in any event, this memo seeks to give the Court notice of the unusually large number of evidentiary issues that may arise at trial and the defendant is prepared to brief these issues in the future as needed.

This case concerns marketing and sales practices at the pharmaceutical company Warner Chilcott. The Government has charged Mr. Reichel with conspiracy to violate the Anti-Kickback Statute, alleging that Mr. Reichel conspired with members of the Warner Chilcott sales force in a company-wide scheme to bribe doctors to write prescriptions from January 2009 (more than eight years after Mr. Reichel started at Warner Chilcott) until February 2012 (six months after he left).[1]

There is no witness—out of the more than 230 interviewed by the Government over the course of its four-year investigation—who has testified that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ And in the more than 90 hours of secret recordings produced by the Government, there is not a single recording of an agreement to commit a crime. To the contrary, several witnesses—including one of the alleged coconspirators who reported directly to Mr. Reichel—have testified that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The Government concedes that the supposed bribe payors in an unlawful agreement "may not have recognized what they were doing was wrong." Opp'n (ECF No. 63) at 11, n.5. Without any direct evidence of a conspiracy, the Government's case against Mr. Reichel relies instead on management and hiring practices, comparisons to other companies, character evidence, culture, and speculation from witnesses (who, for the most part, had little or no direct interaction with Mr. Reichel) about what Mr. Reichel meant or intended in speeches to hundreds of people. The defendant filed motions *in limine* to exclude much of this evidence but numerous evidentiary issues will nevertheless remain.

---

[1] Although the Government alleges that the conspiracy was company-wide, the Indictment lists only six drugs, even though Warner Chilcott sold at least 11 drugs during this time period. *See* Ex. A (Excerpt of 2/24/12 Warner Chilcott Annual Report (10-K)) at 65) (listing revenue from eleven principal drugs in addition to "other" products).

2

Mr. Reichel was the president of Warner Chilcott from 2000 to August 2011. The Government alleges that beginning in January 2009—after Mr. Reichel had already been president of Warner Chilcott for more than eight years and spent decades building a reputable career in the pharmaceutical industry—Mr. Reichel began conspiring with members of the Warner Chilcott sales force to pay kickbacks to doctors in exchange for prescriptions of Warner Chilcott drugs. According to the Government, Mr. Reichel did so by establishing a company-wide sales strategy of taking doctors out to medical education dinners, or "med eds," and paying doctors to speak at med eds.[2]

Med eds and speaker programs had been part of Warner Chilcott's sales strategy prior to 2009. They were approved by the company's legal department and set forth in its written policies, which prohibited the payment of any kickbacks and contained rules and restrictions that were stricter than the Anti-Kickback Statute. Nevertheless, the Government alleges that beginning in January 2009, Mr. Reichel intended for the sales force to violate the policies that he had put in place and start using med eds and speaker payments as an unlawful *quid pro quo*. Mr. Reichel allegedly communicated that unlawful intent by encouraging the sales force to use dinners to "build relationships" and have "business conversations" with doctors in which they "leveraged relationships" by "holding [doctors] accountable" to their commitments to prescribe—all of which the Government alleges to be euphemisms for paying kickbacks in exchange for prescriptions—and by instructing the sales force not to use speakers who did not have "clinical experience," which the Government claims to be a euphemism for "active ongoing prescribing." Ind. ¶ 11(d), (f), (g), (m). Mr. Reichel used these terms for years and the

---

[2] There is also an allegation that providing coffee and snacks to staff is a federal felony under the Anti-Kickback Statute. Ind. ¶ 11(f), (l).

Government will introduce no evidence that beginning in 2009 they were suddenly code for bribery.

The Government intends to prove its case against Mr. Reichel by eliciting evidence that some sales representatives conducted med eds and speaker programs in a manner that was not permitted by the company's policies (e.g., by spending more than $125 per person at dinner), that compliance was not emphasized, that Warner Chilcott was different from other pharmaceutical companies, that representatives were encouraged to develop relationships with doctors, that when Mr. Reichel directed the sales representatives to have "business conversations" with doctors there were some individuals who interpreted him to mean that they should tie dinners to prescriptions as a *quid pro quo*, that doctors would not be chosen as speakers if they did not purchase the drug (a requirement that was in the policy and trainings approved by the company's lawyers), that Warner Chilcott preferred to hire young, aggressive sales representatives who had little or no prior pharmaceutical experience, and that there was pressure on Warner Chilcott sales representatives to succeed. *See, e.g.*, Ex. B ███████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ █████████████████ But the Government has no direct evidence that Mr. Reichel ever instructed or agreed with anyone to use a med ed or speaker payment as a *quid pro quo*. Instead, the Government's case relies almost entirely on inadmissible circumstantial evidence that is irrelevant, misleading, and prejudicial.

4

A. **Testimony Regarding Witnesses' Understanding of What Mr. Reichel Meant Is Inadmissible.**

Nowhere in the millions of pages or 90-plus hours of recordings produced by the Government is there a single statement from Mr. Reichel in which he confirms the Government's interpretation that terms such as "business conversations" were euphemisms for reminding doctors that they were expected to prescribe in exchange for dinners or speaker payments. To the contrary, the documentary evidence and recordings—including notes and recordings made by Government cooperators and without Mr. Reichel's knowledge—confirm that the terms the Government alleges to be euphemisms were used by Mr. Reichel to refer to lawful and legitimate sales practices that have nothing to do with offering or giving a *quid pro quo*. In Mr. Reichel's own words, a business conversation meant saying to a doctor: ███████████

████████████████████████████████████████████████████

███████████████████████████████████████ Ex. C ███████

███████████████████████ This is consistent with the written training materials on how to have business conversations. *See* Ex. D ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

Nevertheless, the Government insists that when Mr. Reichel instructed the sales force to have "business conversations," he meant for them to tell doctors that they had to write prescriptions in order to get free dinners or speaker fees. The Government's theory relies entirely on the testimony of witnesses as to what <u>they believed</u> Mr. Reichel to be saying when he used terms such as "business conversations" and "clinical experience." For example, ████

5

███████████████████████████████████████████████████████████

█████████████████████████████████████████████ Ex. E ███████

██████████ *see also* Ex. F ████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████[3]

The defense will object to evidence of what Government witnesses imagine Mr. Reichel meant. Other individuals' beliefs or understandings as to what Mr. Reichel meant are completely irrelevant to the question of Mr. Reichel's intent, which must be determined by the jury based on the facts presented (e.g., the words that Mr. Reichel actually used). Allowing witnesses to give their opinion as to what Mr. Reichel intended when he spoke would "merely tell the jury what result to reach." *United States v. Meises*, 645 F.3d 5, 16 (1st Cir. 2011). Lay opinion testimony is inadmissible under Fed. R. Evid. 701 when "the jury can readily draw the necessary inferences and conclusions without the aid of the opinion." *Lynch v. City of Boston*, 180 F.3d 1, 17 (1st Cir. 1999); *see United States v. Gorny*, Crim. No. 13-70, 2014 WL 4262178, at *3-4 (W.D. Pa. Aug. 27, 2014) (excluding testimony that defendant was engaged in a "ruse," as witnesses would testify as to what the defendant said and the circumstances surrounding his statement, and "'the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant knew'") (quoting *United States v. Anderskow*, 88 F.3d 245, 250 (3d. Cir. 1996)). Here, witnesses can testify as to what Mr. Reichel actually said, and they can provide the jury with the other facts on which they based their opinion (to the extent that those facts are

---

[3] It is also not clear from the witnesses' testimony whether their description of these terms reflect their actual understanding at the time, or whether they were simply agreeing to the Government's leading characterizations that permeate the grand jury transcripts. *See, e.g.*, Ex. G ████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████████████████

independently admissible), but any inference to be drawn from those facts as to what Mr. Reichel meant or intended can and should be drawn by the jury and by no one else.[4]

Further, the majority of the witnesses who testified before the grand jury had no direct communications with Mr. Reichel. Their only exposure to him was through company-wide meetings and voicemails. Those witnesses' purported understanding does not reflect any prearrangement with Mr. Reichel, but rather is based on their own unsupported speculation about what he meant. *See United States v. Kaplan*, 490 F.3d 110, 115, 119 (2d Cir. 2007) (finding no foundation for informant's opinion that when defendant said "he had handled cases like this before" he was referring to fake accident cases, even though they worked together, as informant's basis for his opinion was "extremely vague").

Testimony about witnesses' own interpretations of Mr. Reichel's statements is also prejudicial, confusing, and misleading. The jury could be led to conflate a witness's own understanding or belief with the evidence of what Mr. Reichel actually said. For example, the jury may believe that Mr. Reichel actually described a business conversation as referring to a *quid pro quo* when the only evidence relates to *other* individuals' understanding of that term. This is particularly prejudicial as the issue of Mr. Reichel's intent will be critical at trial, and proof that Mr. Reichel "willfully joined in the agreement must be based upon evidence of his[] own words and/or actions." Pattern Crim. Jury Instructions for the District Courts of the First Circuit, § 4.18.371(1) (2015).

---

[4] Further, no witness can opine on what Mr. Reichel meant based on hearsay statements of other individuals about what they heard Mr. Reichel say. For example, some sales representatives who had little or no contact with Mr. Reichel may have based their interpretation of his statements on what their supervisors told them about Mr. Reichel's statements. Lay opinion based upon totem-pole hearsay—rather than the witness's own first-hand observation—is not "rationally based on the witness's perception" as required by Rule 701(a). *See United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (explaining Rule 701(a) "'is the familiar requirement of first-hand knowledge or observation'") (quoting 1972 Advisory Committee Notes to Rule 701).

B.      **Warner Chilcott's Hiring Practices Are Irrelevant and Prejudicial.**

The defendant will object to the Government trying to show that Warner Chilcott hired young, aggressive sales representatives with little or no pharmaceutical experience. Ind. ¶¶ 11(q), (r); Ex. H (2/25/16 Status Conference Tr., ECF No. 59) at 13:1-6. The Government believes that Warner Chilcott "hired precisely the types of employees who would carry out the conspiracy in terms of paying illegal remuneration to doctors . . . ." *Id.* at 13:1-6. Evidence of Warner Chilcott's hiring preferences is irrelevant and prejudicial, as the Government's theory relies on the impermissible and unsupported assumption that individuals who are young, or who lack experience, are somehow more likely to be criminals. Further, the defendant has filed a motion *in limine* to exclude evidence of the ECI personality test.

C.      **Evidence of Mr. Reichel's Management Style Should Not Be Allowed.**

The defendant will object to evidence of "management style." Mr. Reichel anticipates that the Government will argue that Mr. Reichel created a "culture of fear" in which sales representatives were ranked based on performance, low performers faced termination, and employees were mocked, berated, or belittled.[5] The Government should not be permitted to introduce this testimony at trial, as it is impermissible character evidence and irrelevant to the conspiracy charge. A theory that Mr. Reichel pressured Warner Chilcott employees into breaking the law by berating them or terminating low performers requires numerous unsupported logical leaps, including the assumption that individuals who are under pressure to succeed are

---

[5]     For example, one witness testified that ▮▮▮▮▮▮ Ex. I ▮▮▮▮▮▮ Another witness described an incident in which ▮▮▮▮▮▮ Ex. J ▮▮▮▮▮▮ Several witnesses claimed that ▮▮▮▮▮▮ Ex. K ▮▮▮▮▮▮ Witnesses also described meetings in which ▮▮▮▮▮▮ *See, e.g.*, Ex. L ▮▮▮▮▮▮

8

likely to break the law. At most, some witnesses may point to fear of Mr. Reichel as the reason why they chose to break the law, but that is not relevant in this case as it is not evidence of what *Mr. Reichel* intended.

The only reason to offer evidence of Mr. Reichel berating or mocking employees would be to attack Mr. Reichel's character and "invite[] the jury to render a verdict on an improper emotional basis," which is impermissible under Rule 403. *United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000); *Rodriguez v. Senor Frog's De La Isla, Inc.*, 642 F.3d 28, 35 (1st Cir. 2011) (excluding evidence that had only one purpose—to convince the jury that the plaintiff was a "bad person"—as unfairly prejudicial). Such testimony is also likely to mislead the jury into believing that this case is about Mr. Reichel's management style, rather than whether the Government has proven that he agreed and intended to violate the Anti-Kickback Statute. This testimony will lengthen the trial and cause distraction: for example, if the Government introduces testimony similar to what it elicited in the grand jury where ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, Ex. M ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### D. Witnesses Should Not Be Allowed to Testify as to Statements That They Cannot Attribute Directly to Mr. Reichel.

Numerous witnesses testified in the grand jury that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, Ex. N ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Other witnesses testified about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. O ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9

▬▬▬ None of this testimony can be admitted, as proof that Mr. Reichel joined in a conspiracy must be based upon evidence of his own words or actions. Pattern Crim. Instr. § 4.18.371(1). The Government also cannot prove that any of these statements are coconspirator statements if the witness is not able to identify the declarant. Such testimony would also be highly prejudicial and risk misleading the jury into conflating Mr. Reichel with ▬ ▬▬▬ or other members of Warner Chilcott management.

### E. The Government Should Not Be Permitted to Suggest That Warner Chilcott Drugs Were Worse Than Other Drugs.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬ *See* Ex. P ▬▬▬▬▬▬▬▬ The Government should not be permitted to ask these types of questions at trial, as the adverse effects of any Warner Chilcott drug are completely unrelated to whether Mr. Reichel entered into a conspiracy with members of the Warner Chilcott sales force to violate the Anti-Kickback Statute by providing remuneration to doctors in exchange for prescriptions of Warner Chilcott drugs. Allowing the jury to hear about adverse effects or other issues surrounding Warner Chilcott drugs will also be prejudicial, misleading, and confusing, as this is not a case about off-label promotion or whether patients were harmed by any of these drugs. Further, these types of questions will lengthen the trial by requiring the introduction of additional evidence on an issue that is peripheral, at best, as Mr. Reichel will have to demonstrate that Warner Chilcott drugs did not in fact have worse effects.

### F. The Government Must Establish Proper Foundation for Any Handwritten Notes or Emails It Intends to Admit into Evidence.

The Government will likely attempt to introduce a number of handwritten notes and emails into evidence at trial. These documents cannot be admitted on a blanket basis as business records. Rather, the Government must lay the proper foundation to establish that each individual

10

document satisfies every factor under Rule 803(6). This showing will be difficult to meet in many cases, as a number of emails and notes were clearly not written at or near the time of the act or event recorded. *See* Fed. R. Evid. 803(6)(A); *Ira Green, Inc. v. Military Sales & Serv. Co.*, 775 F.3d 12, 20 (1st Cir. 2014) (district court erred in admitting emails because the plaintiff failed to establish that the emails were made at or near the time of the act or event recorded). Further, the Government would have to establish that the writer of the note or email had a "business duty to make and regularly maintain [emails] of this type" and was required to document the particular event. *See* Fed. R. Evid. 803(6)(C); *United States v. Ferber*, 966 F. Supp. 90, 98 (D. Mass. 1997) (email recounting a phone conversation was inadmissible under Fed. R. Evid. 803(6) because there was not sufficient evidence that Merrill Lynch required records of phone conversations to be maintained). The Government has asserted that Warner Chilcott had a policy of not putting anything in writing, including in emails. *See* Ex. Q ████████ ████████ ████████ ████████ Accordingly, it is unclear to the defendant how a Warner Chilcott employee email was part of a regular practice to record as required for admissibility under Rule 803(6).

The handwritten notes present additional challenges to admissibility, as many of these notes were taken during meetings attended by a number of people, but the identity of the speaker is often not recorded in the note. Further, some of the handwritten notes that the Government has shown to witnesses appear to have been notes made in preparation for upcoming meetings or

11

conversations, or as a means of summarizing past meetings or conversations, which would prevent them from qualifying under a hearsay exception.

## **CONCLUSION**

The defendant will work cooperatively to narrow and identify evidence issues prior to trial and will file a more comprehensive pretrial memorandum before May 23, 2016.

Respectfully submitted,

CARL REICHEL

By his attorneys,

 **/s/ Joseph F. Savage Jr.**
Joseph F. Savage Jr. (BBO # 443030)
Yvonne W. Chan (BBO # 669223)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000
jsavage@goodwinprocter.com
ychan@goodwinprocter.com

William J. Harrington (pro hac vice)
Anne E. Railton (pro hac vice)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
wharrington@goodwinprocter.com
arailton@goodwinprocter.com

Dated: March 21, 2016

## **CERTIFICATE OF SERVICE**

      I, Joseph F. Savage Jr., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 21, 2016.

                                        **/s/ Joseph F. Savage Jr.**
                                        Joseph F. Savage Jr.

ACTIVE/85387801.11