UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 15-CR-10324-DPW |
| W. CARL REICHEL, | |
| Defendant. | |

## DEFENDANT'S TRIAL BRIEF

Mr. Reichel submits this Trial Brief to outline the deficiencies in the Government's Case.

## I.   THE GOVERNMENT WILL NOT BE ABLE TO PROVE THAT MR. REICHEL HAD SPECIFIC INTENT TO PAY KICKBACKS.

The central issue at trial in this case will be the question of Mr. Reichel's intent: did he have the specific intent to violate the Anti-Kickback Statute by paying kickbacks for the explicit purpose of causing prescriptions to be made in exchange for remuneration, or did he believe that he was encouraging sales practices that were intended to generate increased business in a lawful manner? The law requires that Mr. Reichel's intent be proven through evidence of his own words or actions. But after a five-year investigation in which dozens of witnesses testified before the grand jury and hundreds were (and continue to be) interviewed, and more than 90 hours of secret recordings were made by Government informants, the Government still has not identified a single statement or action from Mr. Reichel showing that he intended to violate the Anti-Kickback Statute. This is so even as the Government's case-in-chief is apparently expanding in length: the Government now identifies 34 potential witnesses when the estimated length of trial was based on the Government having approximately 20 witnesses. Yet despite this expansion, all that the Government has found is evidence that Mr. Reichel did not intend to

follow a set of <u>voluntary</u> industry guidelines that do not set forth the standard for what is legal, and witnesses who confuse those guidelines with the requirements under the law.

> **A.** **There Is No Evidence That Mr. Reichel Intended To Violate the Anti-Kickback Statute.**

The Government's investigation into Warner Chilcott sales practices began at least five years ago, in the spring of 2011. The earliest secret recording made by a Government informant is from May 2011.[1] Over the next several years, six different Government informants recorded over 90 hours of meetings, conversations, and telephone calls. Most of these recordings are of statements made by other individuals, in Mr. Reichel's absence. There is only one secretly recorded meeting in which Mr. Reichel is present, and none of Mr. Reichel's statements on that recording suggest any knowledge of illegality or intent to violate the law. Instead, Mr. Reichel's statements at that meeting consist of praising the sales force for a survey ranking Warner Chilcott's sales force as the best in the country, explaining a credit card program for Doryx, and instructing the sales force to sell the science—which hardly reflect the criminal intent the Government has accused him of. And although the Government's informants recorded dozens of phone calls, the Government never once made a single attempt to record a telephone conversation with Mr. Reichel.

Nor is there a single witness statement or testimony in any of the hundreds of interview memoranda and over 50 grand jury transcripts which reflects that Mr. Reichel had the specific intent to violate the Anti-Kickback Statute, or even knowledge of any illegality. Despite the Government's representation that there is a witness, ██████████████, who will testify that "<u>warned the defendant</u> that taking physicians out for dinner, without an educational component, and leveraging prescriptions from paid speakers, <u>was illegal</u>," ECF No. 102, at 2

ACTIVE/85712081.7

(emphases added), this testimony is not reflected anywhere in the two interview reports of this witness, including the one that was just produced less than two weeks ago.  Instead, the interview reports reflect that the witness ███████████████████████████████████████ and that ████████████████████████████████████████████████████ ██████████████████████████████████████ and that the witness ██████ ██████████████████████ Ex. 1 █████████████████████████ Ex. 2 ██ ████████████████████[2]  If ████████████ had actually warned Mr. Reichel that Warner Chilcott's practices were illegal—as opposed to just being non-compliant with the voluntary PhRMA code—one would expect ████ to have been the Government's star grand jury witness.  Instead, █████████████ was only interviewed once by telephone before Mr. Reichel was indicted, and ██ was never called to testify before the grand jury.

The lack of evidence of specific intent explains why even after a five-year investigation the Government is continuing to identify and interview new witnesses with just three weeks left to trial.  The interview notes and reports produced to Mr. Reichel in the past week and a half include interviews of thirteen witnesses who did not testify before the grand jury, of which ten had never even been interviewed by the Government.  They, too, confirm the absence of any evidence that Mr. Reichel had the requisite specific intent.  *See, e.g.*, Ex. 4 ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 5 ███████████████████████

---

[1]    There are other, earlier recordings made by Government witnesses, but May 2011 appears to be the first time an informant made a secret recording as part of the Government's investigation.

[2]    Neither interview report says that the witness "warned" Mr. Reichel that Warner Chilcott practices were "illegal."  Rather, it appears that the witness ████████████████████████████████████████ ████████████████████████████████████████████████████ █████████ Ex. 1 ██ Ex. 2 ██ A number of witnesses have conflated the PhRMA code with the law, but as



## B.   <u>Evidence of Mr. Reichel's Good Faith Is Admissible.</u>

Contrasted against the absence of any evidence of specific intent is the wealth of evidence that Mr. Reichel stopped, or refused to follow, non-compliant practices when he learned of them even though such sales practices would have increased the number of Warner Chilcott prescriptions.



---

the Court stated at the April 13 hearing, the PhRMA code is not the law, and the jury should be so instructed. *See* Ex. 3 (4/13/16 Tr.) at 27:8-14, 43:14-19.

ACTIVE/85712081.7



Ex. 14

The Government states that this evidence is "arguably inadmissible" because two of these examples involved concerns reported by third parties and the conduct "relate[d] to different conspiracies than the one charged here." ECF No. 106, at 9.  But these examples are evidence of Mr. Reichel's good faith and intent to comply with the law, and they rebut the Government's theory that Mr. Reichel pushed sales at all costs.  *See, e.g.*, ECF No. 107, at 2; *cf. United States v. Hayes*, 219 F. App'x 114, 117-19 (3d Cir. 2007) (permitting introduction of specific acts demonstrating compliance with company policy to disprove intent to participate in the charged conspiracy where government alleged the corporate executive defendant orchestrated a "company-wide, top-down" conspiracy).[3]

## II.   THE GOVERNMENT HAS NOT IDENTIFIED CO-CONSPIRATORS WITH SPECIFIC INTENT.

There is also not a single witness who has stated that he or she actually spoke with Mr. Reichel and agreed with him to violate the Anti-Kickback Statute.  To the contrary, several

---

[3]   There is also abundant evidence showing that Mr. Reichel repeatedly encouraged and promoted compliance:



- Ex. 15
- Ex. 16
- Ex. 16
- Ex. 17

ACTIVE/85712081.7

witnesses have testified or told the Government that they did not believe they were doing anything wrong—and some have reiterated this belief in the Government's recent interviews. While the state of mind of other individuals (including their belief or understanding as to what the law required or whether certain practices violated the law) cannot be used to prove Mr. Reichel's intent, the Government must still prove that at least one other person possessed the specific intent to violate the Anti-Kickback Statute because it has brought a conspiracy charge against Mr. Reichel, which requires proof of an agreement with another person who shared the same specific intent as Mr. Reichel. *United States v. Pappathanasi*, 383 F. Supp. 2d 289, 295 (D. Mass. 2005) ("The government must prove a meeting of the minds to commit an unlawful act"). It is not enough for the Government to prove that sales representatives provided inducements to doctors in exchange for prescriptions because they lacked training or because they feared for their jobs, if those individuals did not specifically intend and agree with Mr. Reichel to violate the Anti-Kickback Statute. *Id.*; *see also United States v. Gen. Elec. Co.*, No. CV 96-121-M-CCL, 1997 WL 269491, at *5 (D. Mont. Mar. 18, 1997) ("[T]he essence of conspiracy is the mutual understanding of the coconspirators to try to accomplish a common and unlawful plan.").

Mr. Reichel expects that the Government will not be able to meet its burden of proof on this element at trial. A number of Mr. Reichel's alleged co-conspirators have already denied any knowledge that they were breaking the law at the time of their actions. *See, e.g.*, Ex. 18 ▮▮▮▮▮ ▮▮▮▮▮ As for witnesses who have stated that they knew what they were doing was "wrong," it is not at all clear whether they were referring to breaking the law (as opposed to an internal company policy or other guidelines). For example, ▮▮▮▮ stated that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

6



█████, thus suggesting that what ███ meant was that ███ knew ███ was violating the <u>policy</u>, not the law.  Ex. 19 ██████████████████  Similarly, ██████████ stated that █████████ ██████ Ex. 20 █████████████████████████████████, but nothing in the notes of ███ interview (a report has not been produced) shows what ███ meant by that statement.[4]  It is also not clear if the "wrong" referred to by the witness was part of an agreement with Mr. Reichel.  *See* Ex. 24 (*United States v. Garcia*, 15-CR-10310-PBS, Rule 11 Hearing) at 17-19 (Government witness Timothy Garcia and AUSA Schumacher acknowledging that the "wrong" Mr. Garcia engaged in during his time at Warner Chilcott was hidden from supervisors and in contravention of a company-wide memorandum); *see also United States v. Juodakis*, 834 F.2d 1099, 1104 (1st Cir. 1987) (requiring the "overt act" of the alleged conspiracy to be in furtherance of the "particular agreement" made with defendant).

## III.    THE GOVERNMENT CANNOT PROVE MR. REICHEL'S INTENT TO PAY KICKBACKS BY CITING CLAIMS HE USED THE ECI PERSONALITY TEST TO RECRUIT LAW-BREAKERS.

The Government continues to try to use an element of Warner Chilcott's hiring practices—the ECI personality test—as proof that Mr. Reichel tried to hire people of low moral character and therefore intended to conspire with those people to pay kickbacks to doctors.  The Government argues that Mr. Reichel "insist[ed] on hiring sales representatives who would rather ask forgiveness than permission, who bent the rules to win the game, who believed that a company's rules can be too strict, and were sorry that they *followed* a company's rules."  ECF

---

[4]    Likewise, it is not clear that any of the three witnesses identified by the Government at the April 13 hearing will testify that they believed it was wrong to pay speakers or for medical education events.  The Government provided three names: David Popke, Jeffrey Podolsky, and Mark Pappas.  Ex. 3 at 61:2. ████████████████████ *See* Ex. 21 █████████████████████ ██████████████ cryptic statement does not identify the law that he believed he was breaking, nor does it identify the conduct to which he was referring.  Ex. 22 ████████████ ████████████████████ Similarly, the recently-produced notes of an interview with ██████ ███████████████████████████████████████████████████

No. 103, at 4.   At the motion *in limine* hearing, the Court relied upon the Government's characterization of the proof concerning ECI, noting that "[i]f Mr. Reichel took on the tests saying that this is – and he had materials that said this is the benign interpretation of it, I might think about that a little bit differently, but I don't think that's right.  What he has is the same kind of material that Mr. Schumacher informed me of," and accordingly denied Mr. Reichel's motion to exclude ECI evidence.  Ex. 3 at 51:13-18, 55:19-24.

The Government's evidence does not support the characterization it offered at the hearing.   The materials that were provided to Mr. Reichel present a purely "benign interpretation" of the test, and there is not a single statement or document showing that Mr. Reichel knew or intended that the test would be used to identify rule-breakers.  In light of the actual evidence of Mr. Reichel's knowledge and intent—as opposed to the Government's unsupported speculation—Mr. Reichel believes that the Court's ruling precludes the Government from introducing any ECI evidence.  The Court limited the Government to evidence "tethered to Mr. Reichel's direction," Ex. 3  at 55:14-15, and Mr. Reichel submits there is no such evidence.

The lack of a factual foundation to support the Government's ECI theory exposes the true purpose of the ECI evidence.  The Government wants to use ECI to suggest to the jury that Mr. Reichel purposefully associated himself with people of a law-breaking character and they should therefore infer that they all later conspired to pay kickbacks.  Rule 404(a) squarely prohibits such evidence.  Indeed, even the exception articulated under Rule 404(b) only permits evidence of <u>specific bad acts</u>, not general character evidence, and even then only for certain limited purposes. Nowhere do the rules permit the Government to argue that a defendant knowingly chose to

*See* Ex. 23

associate himself with people of low moral character—in this case, persons of "low sensitivity to rules"—for even the limited purposes articulated under Rule 404(b).

     **A.**     **All of the Documents Received By Mr. Reichel Contain the "Benign Interpretation" of the ECI Personality Test.**

First, <u>all</u> of the documents that Mr. Reichel received regarding the ECI test offered the "benign interpretation" referenced by the Court.   One presentation, ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ Ex. 25 ████████████████████████████████

██████████████████████████████████████ The presentation also notes that ████████████████████████████████████

████████████████████████████████████████████████ *Id.* ███

███ [5]   There is no evidence that Mr. Reichel ever received the interview guide that the Government has cited, and based on which it argues that Mr. Reichel was looking for people who "would rather ask forgiveness than permission, who bent the rules to win the game, who believed that a company's rules can be too strict, and were sorry that they *followed* a company's rules."   ECF No. 103, at 4.   To the contrary, █████████████████████ of ECI, had told the government that ███████████████████████████████ Ex. 27

██████████████████████ There is no evidence showing that Mr. Reichel was involved in that training.

---

[5]   Another presentation, ████████████████████████████████████████

████████████████████ Ex. 26 ██████████████████████████████████

ACTIVE/85712081.7

**B.**     **There Is No Evidence That Mr. Reichel Intended to Use the ECI Test to Identify And Hire Law-Breakers.**

As the Court stated, "the question is how Mr. Reichel is going to use [the test]."  Ex. 3 at 54:8-9.  But there is no email, presentation, or any other document in which Mr. Reichel states that the purpose of the test is to find the law-breakers, nor is there any other evidence that shows Mr. Reichel believed or intended for the ECI test to be used to identify and hire individuals who would not follow the rules, or even those individuals who had low scores on sensitivity to the rules.

Ex. 28

In its opposition to Mr. Reichel's motion *in limine*, the Government highlighted the fact that                                    ECF No. 103, at 3.  But nothing in these reports supports the Government's theory that what Mr. Reichel was looking for was law-breakers and that he did so by looking for low scores in sensitivity to rules.

*Compare* Ex. 29

ACTIVE/85712081.7



with Ex. 30 ███████████████████████████████████ ████████████ Indeed, for the candidate with the lowest score on sensitivity to rules, ██ ███████████████████████████████████████████████ ████████████████████████████████████████████ *See* Ex. 30 ██ Conversely, for the candidate whose sensitivity to rules score was ███████████ ████████████████████ *See* Ex. 29 ███

There is simply no support for the Government's theory that Mr. Reichel "misused" the test by using it to identify and hire individuals who had the lowest scores on sensitivity to rules. In fact, █████████ told the Government that ████████████████████████████████ ████████████████████████████████████████████████ ██████████ Ex. 27 ███ Mr. Power and others who spoke with Mr. Reichel about the ECI test will likely be called as a witness if the Government introduces ECI evidence.[6]

The only evidence regarding the use of the ECI test is that it identified whether a candidate fell within a certain footprint for the traits measured, and for sensitivity to rules and caution, that footprint was right in the middle of the scale. The Government cannot simply say that the test <u>could</u> have been used to identify and hire people who had low scores on sensitivity to rules, and from that, argue that this is what Mr. Reichel <u>must</u> have intended to do. Based on the Court's ruling, the Government's evidence must be "tethered to Mr. Reichel's direction." Ex. 3 at 55:14-15. The Government's theory that measuring someone's "sensitivity to rules" (a trait which does not mean what the Government claims it means) must mean that the ideal candidate was a law-breaker is akin to saying that any potential employer who asks whether a

---

[6]  The only testimony that the Government cites for its "rule breaking" theory consists of speculation from district managers about what the traits meant—speculation that is unconnected to any instruction or direction from Mr. Reichel—which the Court has ruled inadmissible. *See* Ex. 3 at 48:13-14 ("[C]ertainly characterization by witnesses about something beyond that is not something I'm going to permit.").

ACTIVE/85712081.7

candidate has ever been convicted of a felony—a standard question in job applications—is necessarily looking to hire felons.[7]

## IV. THE GOVERNMENT'S CASE RELIES HEAVILY ON EVIDENCE FROM AFTER MR. REICHEL'S DEPARTURE.

The Government's proposed exhibit list underscores the urgency of Mr. Reichel's motion to exclude post-departure evidence, which the Court has taken under advisement. Wholly one-third of the Government's proposed exhibits post-date Mr. Reichel's departure from Warner Chilcott; the documents were created when Warner Chilcott's sales strategy apparently took on a new direction after Mr. Reichel's departure in August 2011. Of the Government's 280 proposed exhibits, 79 are dated August 2011 or later, while 167 are from January 2009 to July 2011.[8] *See* Ex. 31 ███████████████████      Further, a number of the Government's witnesses are expected to be asked about events that occurred after Mr. Reichel left. *See, e.g.*, Ex. 32 ██████ ███████████████████████████████████████████████████████████ Ex. 33 ████████████████████████████████████████████████████████████████ ████ Ex. 18 at 115-19 ████████████████████████████████ In fact, one of the

---

[7]     Indeed, even if the Government had any evidence showing that Mr. Reichel approved of all the questions in the interview guide—and it does not—that still would not be enough to show that Mr. Reichel wanted to hire rule-breakers because the Government has presented <u>no</u> evidence of what the "right" answers to those questions were, or what types of answers would have gotten a candidate hired. For example, one of the ECI reports that was sent to Mr. Reichel ████████████████████████████████████████████████████████████ █████████ *See* Ex. 30 ███████ But there is no indication that this question was intended to confirm that the individual was a rule-breaker so that he could be hired. ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████ *Id.* at ████ According to the Government's theory that interview questions were used to identify the people who did the things that were being asked about, Warner Chilcott would have been looking for sales representatives who would back down from confrontation—but the Government's theory is that Warner Chilcott <u>wanted</u> candidates who were willing to confront doctors. ECF 103, at 1.

[8]     The remaining exhibits are undated or from outside the conspiracy period (e.g., immunity letters, plea agreements, summary charts).

Government's witnesses, █████████, did not even join the sales force as a temporary contractor (employed by █████████████) until June 2011, right before Mr. Reichel's departure, and ██ testimony is almost exclusively about events that took place after August 2011.  *See* Ex. 34 ████████████████.

The Government is trying to present a story to the jury that focuses heavily on what happened after Mr. Reichel left, and the only reason for doing so is because that conduct is <u>not</u>, as the Government claims, "the exact same conduct that happened the two prior years." Ex. 3 at 61:18-20.  Many of the Government's post-departure exhibits relate to market share tracking, a practice that was developed and implemented by █████████ after Mr. Reichel's departure and without Mr. Reichel's knowledge, at a time when █████████ confirmed that Mr. Reichel no longer had a substantive role in the company.  Ex. 18 ████████; Ex. 35 █████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████████████████ That practice (which was stopped by the compliance department) was entirely different from the requirement that speakers use the product (which was approved by the compliance department).   The Government's apparent intent to focus this trial on the six months after Mr. Reichel's departure is an improper attempt to persuade the jury of Mr. Reichel's criminal intent through the words and actions of others, and the practices that they developed without Mr. Reichel's knowledge.  This should not be allowed.

## V.  THE GOVERNMENT'S CASE-IN-CHIEF INTENDS TO RELY ON INADMISSIBLE DOCUMENTARY EXHIBITS.

On April 29, 2016, the Government provided Mr. Reichel with its preliminary exhibit and witness lists, consisting of 34 witnesses and 280 exhibits.  While Mr. Reichel has not had the

ACTIVE/85712081.7

opportunity to fully review each of the Government's proposed exhibits, his review thus far has identified a number of evidentiary issues that will arise at trial.[9]

### A.    Ted Power's Notes Of An Interview With Mr. Reichel Are Hearsay.

The first document on the Government's exhibit list is an interview of Mr. Reichel by ████████. *See* Ex. 36 ████████████████████████████ While the Government may introduce evidence of Mr. Reichel's statements, it is not at all clear that the notes in this document reflect Mr. Reichel's statements rather than ████████ own impressions or interpretations of those statements, and the Government apparently does not intend to call ██ ████ to testify about what these notes captured. *Sullivan v. Temple Univ.*, No. CIV.A. 11-7305, 2014 WL 641341, at *3 (E.D. Pa. Feb. 19, 2014) (summary of interview which "contains narration and comments" not admissible as present sense impression). Further, ████████'s notes of Mr. Reichel's statements is hearsay and the Government cannot establish that it falls under any hearsay exception without calling ████████ as a witness to testify about the circumstances surrounding the preparation of the notes.

### B.    Text Messages Are Not Admissible As Business Records.

The Government has also identified several voluminous sets of text messages on its preliminary exhibit list.  These exhibits are inadmissible hearsay.  *See Gonzalez v. City of Chicago*, No. 11-CV-8356, 2015 WL 5159945, at *1 (N.D. Ill. Sept. 1, 2015) (excluding text messages as inadmissible hearsay).  And even if <u>records</u> of text messages (e.g., date and time a particular text was sent) were admissible as business records if those records met the requirements of Fed. R. Evid. 806(3),[10] each <u>statement</u> contained within the text messages must

---

[9]    Mr. Reichel will provide the Government with notice of his objections to specific proposed exhibits after he has completed his review.

[10]    At least of one the Government's proposed exhibits is plainly not a business record as it appears to consist only of a screen shot. *See* Ex. 37 ████████████████████

set above

still be independently admissible.  *Cf. United States v. Jackson*, 208 F.3d 633, 637 (7th Cir. 2000) (even if internet service provider could retrieve information about what customers posted or sent, that "does not turn that material into a business record" and those postings are inadmissible hearsay).  For example, proposed exhibit 133 consists of almost 90 pages of text messages dated May 2011 to February 2012 which were purportedly made to or from a telephone belonging to or used by a Warner Chilcott sales representative, ███████.  *See* Ex. 38 ████████████████████████ There is no indication of how or by whom these records were produced, and thus this document is inadmissible hearsay that does not fall within the business records exception.  But even if a custodian of records certified that these messages were sent to or from a particular number assigned to a certain individual, these records contain a number of hearsay statements that are inadmissible regardless of whether the identities of the sender and recipient are established.  *See, e.g.*, Ex. 38 ████████████████ ████████████████████.[11]

### C.    Emails Written By Individuals Who Are Not Alleged Co-Conspirators Are Not Admissible Co-Conspirator Hearsay Or As Overt Acts.

A number of the Government's proposed exhibits are emails written by individuals who have not been identified as alleged co-conspirators.  For example:

- Proposed exhibit 20 is an email from ████████████████ ██████████████ *See* Ex. 39 ████████

- Proposed exhibit 39 is an email from ████████████ ████████ *See* Ex. 40 ████████

- Proposed exhibit 45 is an email from ████████████ ████████████████████████

---

[11]   Mr. Reichel's ability to object to the admissibility of these statements is also limited by the fact that the Government has not identified the particular communications within each set of voluminous text messages it intends to introduce.

ACTIVE/85712081.7

*See* Ex. 41

- Proposed exhibit 110 is an email from ██████████████████████ *See* Ex. 42 Proposed exhibit 146 is another email from ████████ *See* Ex. 43

- Proposed exhibit 134 is an email from ████████████████████ *See* Ex. 44 Proposed exhibit 205 is an October 5, 2011 email from ████████████████ *See* Ex. 45

- Proposed exhibit 172 is an August 5, 2011 email from ████████████████ *See* Ex. 46

None of these statements are admissible as co-conspirator hearsay because none of these declarants are alleged to have been co-conspirators. *See* Ex. 47 ████████████████ ████████; Fed. R. Evid. 801(d)(2)(E) (statement must be "made by the party's coconspirator during and in furtherance of the conspiracy").[12] These statements are also not admissible as overt acts in furtherance of the charged conspiracy, because overt acts must be made by co-conspirators in order to be admissible. *United States v. Manges*, 110 F.3d 1162, 1170 (5th Cir. 1997) (conspiracy requires overt act by conspirator, and language of statute "cannot be stretched to include [act] by a non-conspirator"); *United States v. Benussi*, 216 F.

ACTIVE/85712081.7

Supp. 2d 299, 317 (S.D.N.Y. 2002) (indictment insufficient because neither of the actors was

conspirator and receipt of funds by non-conspirator "could never have been an overt act in

furtherance of the conspiracy") *aff'd sub nom. United States v. Salmonese*, 352 F.3d 608 (2d Cir.

2003).

Respectfully submitted,

CARL REICHEL

By his attorneys,

 **/s/ Joseph F. Savage Jr.**
Joseph F. Savage Jr. (BBO # 443030)
Yvonne W. Chan (BBO # 669223)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000
jsavage@goodwinprocter.com
ychan@goodwinprocter.com

William J. Harrington (pro hac vice)
Anne E. Railton (pro hac vice)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
wharrington@goodwinprocter.com
arailton@goodwinprocter.com

Dated:  May 2, 2016

---

[12]    The fact that the Government intends to introduce hearsay by non-conspirators further demonstrates the necessity of a pretrial proffer regarding co-conspirator hearsay statements.

ACTIVE/85712081.7

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph F. Savage Jr., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 2, 2016.

 **/s/ Joseph F. Savage Jr.** 
Joseph F. Savage Jr.

ACTIVE/85712081.7